## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CARDINAL BUILDING MATERIALS, INC.,    )
    )
        Plaintiff,    )
    )
vs.    )  Case No.: 4:20CV963 HEA
    )
AMERISURE INSURANCE COMPANY,    )
    )
        Defendant.    )

## OPINION,  MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, [Doc. No. 53].  Plaintiff opposes the Motion.  For the reasons set forth below, the Motion is granted.

### Facts and Background

Plaintiff's Complaint alleges the following:

Plaintiff owned and maintained the building located at 3634 Pennridge, Bridgeton, MO 63044 ("Building"). Plaintiff operates a large portion of its business out of the Building, where it operates as a wholesale distributor of building materials.

On December 31, 2007, Plaintiff entered into an insurance contract with Defendant, purchasing the "Commercial Package Policy" ("Policy"), which included Commercial Property Coverage. Plaintiff paid all policy premiums owed during the policy period.

On May 23, 2013, a tornado caused significant damage to the Building, its contents, and the surrounding property. The Policy covered the Building for loss, including sections for Building, Building– Law & Ordinance, Business Personal Property, Extra Expense and Business Income.  Following the loss, pursuant to the Policy, Plaintiff made a claim ("Claim") for damages sustained under each section of the Policy.  Plaintiff alleges that the total value of its Claim is $3,077,376.99. Defendant paid Plaintiff $1,549,592.30.

Since Defendant's payment to Plaintiff, Defendant has failed to remit the remainder of the amount owed to Plaintiff under the Policy. The remainder of the loss is covered under the Policy.  Plaintiff has fulfilled all its obligations under the Policy, including paying all policy premiums, providing documentation to aid in Defendant's investigation of the Claim, submitting to an Examination Under Oath, and furnishing a Statement of Loss.

Plaintiff has asked that the remainder of this loss be covered, and Defendant has refused for more than 30 days to accept such loss.  Pursuant to a contract of insurance, Plaintiff has paid the premiums to Defendant and otherwise fulfilled its obligations under the Policy but has been denied the benefits of the contract.

Plaintiff's Policy covers the aforementioned loss, and since Defendant has denied the claim and breached the insurance contract, Plaintiff has been damaged in the amount it cost to repair and/or replace the loss.

[2]

Plaintiff's Complaint states a claim for breach of contract and vexatious refusal to pay its claim.[1]

Defendants seek summary judgment on both counts.

Defendant has submitted a Statement of Uncontroverted Material Facts, to which Plaintiff has responded.  Plaintiff, however, has not satisfied Rule 56 of the Federal Rules of Civil Procedure nor this Court's Local Rule 4.01[2] with respect to a number of Uncontroverted Facts.  Based on Defendant's Statement and Plaintiff's response thereto, the Court finds the following Uncontroverted Material Facts:

Amerisure issued a policy of insurance, Policy No. CPP12934821701, for an effective policy period of December 21, 2012 to December 31, 2013 to Cardinal Building Materials, Inc. ("Policy").

---

[1] On January 14, 2021, the Court dismissed Plaintiff's claim for unjust enrichment.

[2] Local Rule 4.01(E) provides:

    (E) Every memorandum in support of a motion for summary judgment must be accompanied by a document titled Statement of Uncontroverted Material Facts, which must be separately filed using the filing event, "Statement of Uncontroverted Material Facts." The Statement of Uncontroverted Material Facts must set forth each relevant fact in a separately numbered paragraph stating how each fact is established by the record, with appropriate supporting citation(s). Every memorandum in opposition must be accompanied by a document titled Response to Statement of Material Facts, which must be separately filed using the filing event "Response to Statement of Material Facts." The Response must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citation(s) to the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the moving party's Statement of Uncontroverted Material Facts. All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

On May 31, 2013, Cardinal Building Materials sustained a loss from a weather event ("Storm") and subsequently advised Amerisure of said loss. Amerisure opened a claim regarding this loss, Claim No. 1319826 ("Claim").

Since May 31, 2013, Amerisure has issued a total of $ $1,549,592.30 in payments to Plaintiff in relation to Claim No. 1319826. A total of $1,363,795.49 has been paid under the Building Coverage part of the Policy. A total of $209,206.18 has been paid under the Code Upgrade Coverage part of the Policy. A total of $10,754.88 has been paid under the Extra Expenses Coverage part of the Policy. A total of $39,050.80 has been paid under the Business Personal Property Coverage part of the Policy.

On July 16, 2013, Amerisure issued payment to Cardinal Building Materials via Check No. 8105197, in the amount of $176,659.04. The full amount of this payment was paid under Building Coverage part of the Policy. On July 16, 2013, Amerisure issued payment to Cardinal Building Materials via Check No. 8245925, in the amount of $4,653.75. The full amount of this payment was paid under Extra Expenses Coverage part of the Policy. On December 5, 2013, Amerisure issued payment to Cardinal Building Materials via Check No. 8245925, in the amount of $579,676.34. Of this payment amount, $574,739.66 was paid under Building Coverage part of the Policy and $4,936.68 was paid under Code Upgrade Coverage part of the Policy. On February 12, 2014, Amerisure issued payment to Cardinal

[4]

Building Materials via Check No. 8313965, in the amount of $76,818.97. Of this amount, $73,215.45 was paid under Building Coverage part of the Policy and $3,603.12 was paid under the Business Personal Property part of the Policy. On May 22, 2014, Amerisure issued payment to Cardinal Building Materials via Check No. 8418487, in the amount of $ 106,381.54. Of this amount, $63,360.41 was paid under Building Coverage part of the Policy, $36,920.00 was paid under the Code Upgrade Coverage part of the Policy, and $6,101.13 was paid under the Extra Expense Coverage part of the Policy.  On October 1, 2014, Amerisure issued payment to Cardinal Building Materials via Check No. 8554722, in the amount of $ 807,90.38. The full amount of this payment was paid under Building Coverage part of the Policy. On February 13, 2015, Amerisure issued payment to Cardinal Building Materials via Check No. 8694487, in the amount of $88,500. The full amount of this payment was paid under Building Coverage part of the Policy. On February 26, 2015, Amerisure issued payment to Cardinal Building Materials via Check No. 8708063, in the amount of $30,000.00. On April 2, 2015, Amerisure issued payment to Cardinal Building Materials via Check No. 8744246, in the amount of $203,315.10. The full amount of this payment was paid under Building Coverage part of the Policy. On August 12, 2015, Amerisure issued payment to Cardinal Building Materials via Check No. 8898316, in the amount of $94,556.25. The full amount of this payment was paid under Code Upgrade Coverage part of

the Policy. On September 25, 2015, Amerisure issued payment to Cardinal

Building Materials via Check No. 8943460, in the amount of $72,793.25. The full

amount of this payment was paid under Code Upgrade Coverage part of the Policy.

On October 24, 2016, Amerisure issued payment to Cardinal Building Materials

via Check No. 9362642, in the amount of $35,447.68. The full amount of this

payment was paid under Business Personal Property Coverage part of the Policy.

Plaintiff accepted the payments and cashed each of the payments made by

Amerisure.

Between May 31, 2013 and September 20, 2016, Plaintiff  submitted a list,

which was revised several times, purporting to list the damages business personal

property it was claiming. At various times, the list provided included household,

rather than business, items. There were also duplicative items included on the list.

On November 29, 2016, after receiving no information or communications

from Plaintiff disputing the amounts paid for the Claim, Amerisure closed its file.

Amerisure did not receive any correspondence or other communication from

Plaintiff regarding the Claim from September 20, 2016 until November 2, 2017.

On November 2, 2017, Amerisure received communications from Plaintiff's

insurance agent advising that Plaintiff believed it was entitled to additional

coverage under the Policy. In the Spreadsheet, Plaintiff claimed its loss valued at a

total of $2,304,176.81. In the Spreadsheet, Plaintiff included $2,304,180.81 in

various damages for unidentified coverages plus $73,126.59 Plaintiff claimed it

was owed for Overhead. 29. In the Spreadsheet, Plaintiff did not claim it was

entitled to any BPP, Business Income coverage at this time.  Defendant also states

Plaintiff did not include Profit claimed in the Spreadsheet, but Plaintiff claims

Profit was included in the Spreadsheet as being due under the Arc bid to return the

property to similarly the same condition. In the Spreadsheet, Plaintiff claimed that

it was only paid for $1,291,500.33 and was entitled to an additional payment of

$1,012,676.48.

As of November 2, 2017, Plaintiff did not provide any documentation other

than the spreadsheet to support its claimed expenses.

After receiving the spreadsheet, Amerisure made several requests for

supporting documentation, including correspondences and face-to-face meetings

with Plaintiff's insurance agent, but did not receive any information or

documentation necessary for Amerisure to properly investigate Plaintiff's

supplemental claim.

On May 17, 2018, Amerisure sent correspondence to Plaintiff regarding the

status of Amerisure's evaluation of Plaintiff's supplemental claim and requesting

additional information and/or documentation supporting it.

On July 31, 2018, Amerisure sent correspondence to Plaintiff regarding the

status of Amerisure's evaluation of Plaintiff's supplemental claim and advising

that Amerisure was closing its file due to Plaintiff's failure to provide support and failure to cooperate with Amerisure in evaluating its claim.

On October 18, 2018, Amerisure sent Plaintiff correspondence regarding the status of Amerisure's claim investigation and evaluation, the parties' communications to date, and reiterating Amerisure's requests for information and documentation regarding Plaintiff's claim.

On November 19, 2018, Plaintiff's counsel sent correspondence to Amerisure in response to Amerisure's October 18, 2018 correspondence.

Cardinal forwarded eight folders containing nearly 500 pages to Amerisure purporting to provide invoices, estimates, and other documentation allegedly supporting Cardinal's claim for additional damages. In addition to over 300 pages of invoices and estimates, the folders contained over 125 pages of unidentified payments and checks made to various vendors that did not clearly correlate to the invoices/estimates and various lists of personal property and inventory items without any explanation as to the reason for their inclusion. The total amount of all the invoices and estimates produced in the various folders valued $3,735,943.71. This amount included both claimed and (as subsequently explained) unclaimed amounts under building, code upgrade, extra expense, and BPP coverage. Plaintiff did not indicate it was seeking any reimbursement for overhead, profit, or business

income damages in either the November 19, 2018 correspondence or the produced documents.

On December 18, 2018, Amerisure sent correspondence to Plaintiff outlining the still outstanding information and documentation necessary to evaluate Plaintiff's Claim.

On December 28, 2018, Amerisure sent correspondence to Plaintiff providing a breakdown of what has been paid by Amerisure and under what coverages. Amerisure also reiterated its requests for information, documentation, and support.

On January 24, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation, and support.

On January 29, 2019, Plaintiff's counsel sent correspondence to Amerisure's in response to Amerisure's December 18 and 28 correspondences. In the January 29, 2019 correspondence, Plaintiff represented that it was seeking reimbursement for everything contained in CBM 1-81, plus any items in CBM 85-326 that are not already covered in CBM 1-81 and which are attributable to the loss. Plaintiff also submitted, for the first time, an additional list of equipment it claimed was damaged in the loss totaling $143,765.00, in addition to its previous contents and inventory items (CBM455-477). Plaintiff asserted that Amerisure continued to owe

it reimbursement for the Outstanding Items that still needed to be complete that were contained in Folder 7 but did not list any actual amounts or provide any reference to amounts in other documents. Plaintiff further claimed it was seeking additional reimbursement for the damage done to the remaining HVAC units and the parking lights but did not provide any additional information or values for this part of the claim. In addition, Plaintiff advised that since it acted as the general contractor for the reconstruction of the property, it should be reimbursed for 10% Overhead, and for the first time, claimed an additional 10% for Profit. As of January 29, 2019, Plaintiff did not identify and claim for Business Income damages.

In the January 29, 2019 correspondence, Plaintiff also indicated that the documents contained in Folder 5 (CBM 327-361) identified the payments made for work associated with the loss. These documents do not match the amounts Plaintiff is claiming from the vendors listed or the amounts Cardinal claims it incurred in like-kind repairs compared to voluntary upgrades. In the January 29, 2019 correspondence, Plaintiff did not provide any information as to which documents might be duplicative of other documents claimed. In the January 29, 2019 correspondence, Plaintiff instructed Amerisure to calculate the amount Plaintiff is claiming by totaling all the bids found in these folders and subtracting the amount for bids that Amerisure has already paid. Although Plaintiff did not provide a total

damages figure, based on the representations in the January 29, 2019 correspondence and Amerisure's investigation into the produced documents, the total amount claimed was $3,176,277.49.

On March 22, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation, reiterating its requests for information, documentation, and support, and seeking clarification as to the actual numerical amount Plaintiff was claiming it was owed under the Policy.

On May 8, 2019, Plaintiff's counsel sent correspondence to Amerisure. In the May 8, 2019 correspondence, Plaintiff claimed the total value of its Claim to be $3,077,376.99. The May 8, 2019 correspondence also indicated that deductions totaling $82,334.98 were warranted, including $10,600.00 for excess over Code Coverage and $71,734.98 in roof depreciation.

Cardinal provided no information for what items it included within its Code Coverage claims, or how it reached the depreciation value on the roof.

The May 8, 2019 correspondence was the first time Plaintiff made any claim for Business Income coverage. Cardinal had previously sought compensation for business income and Amerisure had paid some amount for extra expense.

On June 7, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation, reiterating its requests for information,

documentation, and support, and noting that the most recent figures provided by Plaintiff vary from those previously produced.

On June 18, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation, reiterating its requests for information, documentation, and support, and noting inconsistencies in what is being demanded by Plaintiff.

On July 12, 2019, Plaintiff's counsel sent correspondence to Amerisure responding to Amerisure's correspondence of June 7 and 18, 2019. In the July 12, 2019 correspondence, Plaintiff claimed the total value of its Claim to be $3,073,597.99. Plaintiff clarified that the amount of BPP claimed in the May 8, 2019 correspondence was incorrect, and that it was only seeking damages for $139,345.50 in Contents Inventory. Plaintiff also clarified that it was only seeking damages for $59,700.00 for Equipment. Plaintiff did not provide any calculation for how it reached its Building, Code, and Extra Expense damages values, but Plaintiff claimed that Amerisure had all the information it needed to detail the amount Plaintiff is owed.

On August 1, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and requesting an examination under oath of Plaintiff's corporate representative regarding the details of Plaintiff's Claim based on the topics included therein.

On August 12, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its request for an examination under oath of Plaintiff's corporate representative regarding the details of Plaintiff's Claim.

On September 6, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation, and support.

On September 27, 2019, Plaintiff's authorized corporate representative, Todd Halpern, submitted to an examination under oath.  Although Plaintiff did not provide a total damages figure during the examination, based on the representations in the examination and Amerisure's investigation into the produced documents, the total amount claimed was $3,248,028.03.

On October 4, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and providing an overview of requested information and documents that it still had not been provided, as identified in Plaintiff's examination under oath, and noting that Amerisure would provide specific issues that are still in need of resolution upon receipt of the examination transcript.

On November 7, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation, and support for following Plaintiff's examination.

On December 3, 2019, Amerisure sent correspondence to Plaintiff providing a detailed description of the outstanding issues, documents, and claim items for which it continued to request Plaintiff provide information or documentation.

On December 27, 2019, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation, and support following Plaintiff's examination and Amerisure's identification of specific issues of concern.

On February 11, 2020, Plaintiff's counsel sent correspondence to Amerisure in response to Amerisure's December 27, 2019 correspondence. Plaintiff provided some additional documents. Plaintiff also advised that it could not identify documentation supporting the entire amount it claimed for Coffey Design services and would accept less than previously identified.

On April 22, 2022, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation, and support following Plaintiff's examination and Amerisure's identification of specific issues of concern.

On May 21, 2020, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation and support following Plaintiff's examination and Amerisure's identification of specific issues of concern.

On July 7, 2020, Amerisure sent correspondence to Plaintiff regarding the status of the claim investigation and reiterating its requests for information, documentation and support following Plaintiff's examination and Amerisure's identification of specific issues of concern.

On July 24, 2020, Plaintiff filed its Complaint in this litigation. In its Complaint, Cardinal alleges that the total value of its Claim is $3,077,376.99. Plaintiff admits that Amerisure has paid Plaintiff $1,549,592.30. In its Complaint, Plaintiff did not provide any further breakdown as to the make-up of the total amount or any specific values for their Building, Code, Extra Expenses, BPP, or Business Income coverage claims. The Complaint does not acknowledge deductions for overpayment or depreciation that were previously recognized in communications.

On February 5, 2021, Plaintiff served its initial disclosures pursuant to Fed. R.Civ. P. 26(a)(1).

On April 14, 2021, Plaintiff served its Responses to Amerisure's First Interrogatories.

On April 14, 2021, Plaintiff served its Responses to Amerisure's First Requests for Production of Documents.

Amerisure attempted to obtain documents and other business records regarding the work that was allegedly performed for Plaintiff from Mackenzie Renovation on its own multiple times.

Amerisure attempted to obtain documents and other business records regarding the work that was allegedly performed for Plaintiff from Coffey Design on its own multiple times.

On June 11, 2021, Plaintiff made its expert disclosures. The only expert Plaintiff disclosed in this litigation was Barton Bennett. On July 21, 2021, Plaintiff's expert Barton Bennett was deposed in this matter. Mr. Bennett opined that the total replacement cost value of Plaintiff's Claim was $2,625,605.07. Mr. Bennett's opinion on the value of Plaintiff's claim did not include any damages under Business Personal Property coverage. Mr. Bennett's opinion on the value of Plaintiff's claim did not include any damages under Extra Expense coverage. Mr. Bennett's opinion on the value of Plaintiff's claim did not include any damages under Business Income coverage.

Approximately $175,000 worth of invoices and estimates relating to unidentified alleged building, code, and extra expense damages that were included

within the documents produced by Plaintiff prior to suit are not included within Mr. Bennett's Report.

Throughout his deposition, Mr. Bennett admitted that he was unable to provide an opinion that damages he included within his Report were related to the Storm.

Throughout his deposition, Mr. Bennett admitted that his report only included damages that were "potentially" related to the Storm. Mr. Bennett included damages in his Report based on Plaintiff's own conclusion that they were related to the Storm.

Throughout his deposition, Mr. Bennett admitted that the damages included in his report may be duplicative or contain overlap.  Mr. Bennett formed his opinions without reviewing documents Amerisure provided to Plaintiff, its scope of work, or the amount Amerisure has paid.

Mr. Bennett does not know the amounts Plaintiff has paid to other contractors or vendors. Mr. Bennett cannot confirm whether the expenses Plaintiff has incurred due to Storm-related repairs exceeds the amount Amerisure has paid.

On August 25, 2021, Amerisure made its expert disclosures pursuant to Fed. R.Civ. Pro. 26(a)(2)(B) and (C).  In its expert disclosures, Amerisure disclosed Jeff Grieve to provide opinions and testify as to the contents of his report, Nixon's

inspections of the property, damage estimates and claim handling, his review of Nixon's file materials and analysis of the loss and coverage for the loss.

Mr. Grieve issued an expert report in connection with this matter. Among other things, Mr. Grieve provides the expert opinion that the total value of Plaintiff's Storm-related loss is $1,411,307.77.

In its expert disclosures, Amerisure disclosed Dimitrios Zavradinos to provide opinions and testify as to the contents of his report, his observations regarding damage to the property and causation. Mr. Zavradinos issued an expert report in connection with this matter.

In its expert disclosures, Amerisure disclosed Brian Wehmeier to provide opinions and testify as to the contents of the SEA, Ltd. report, SEA Ltd.'s observations regarding damage to the property and causation.

In its expert disclosures, Amerisure disclosed Michael McIntyre to testify and offer opinions and testimony in accordance with the SEA Ltd., Report, and his observations regarding his inspection of the property, damage, and causation.

Mr. Wehmeier and Mr. McIntyre issued an expert report in connection with this matter.

Plaintiff did not depose any of Amerisure's disclosed experts.

Plaintiff is no longer pursuing its claim for damages under Business Income coverage.

Mr. Halpern acknowledged that and revealed that Plaintiff has duplicated the same damages under multiple coverages. Mr. Halpern was unable to support Plaintiff's claimed damages as he testified that many of the documents produced to Amerisure were duplicative, mere estimates for unperformed work, or related to non-covered damages.

Following the Storm, Plaintiff chose to completely renovate its Building, and it is "impossible" to determine what parts of invoices are storm related. He testified that the building remained 70% the same. Plaintiff acknowledges that Amerisure is only required to pay for what it would cost to return Plaintiff's property to its pre-loss condition.  Mr. Halpern acknowledged that many documents included in the production related to non-covered expenses, that a number of these documents relate to upgrades for which Plaintiff does not expect Amerisure to pay.  He further testified that a number of the documents produced are estimates to bring the property to pre-loss condition.

Further, even after Mr. Halpern's testimony, Plaintiff still had not produced support for all of its claimed damages.

The documents Plaintiff referred to include both estimates for which Plaintiff cannot confirm completion of corresponding work and invoices for work which Plaintiff cannot confirm were related to the loss or in excess of the estimates provided. They include check ledgers purporting to document payments made for

work related to both the Storm-repairs and voluntary renovation of the building,
and Mr. Halpern admits that he cannot distinguish between the costs for both.

First, Plaintiff has produced no evidence that any of these items were
actually damaged at all, let alone due to the Storm. Plaintiff's basis for claiming
these items is simply that they were in the building at the time of the Storm.
However, Plaintiff has nothing to support its claim other than Mr. Halpern's non-
expert opinion that they could be damaged. Mr. Halpern's testimony established
that the Equipment had not been used in at least three years prior to the Storm,
were up for sale without any interested buyers, and Plaintiff have no intention to
use it. The Window Closeouts were purchased in 2005 and had been sitting in
Plaintiff's inventory, unused, for eight years before the Storm. The basis for this
amount is estimated loss of revenue allegedly incurred when ARC Construction
ceased doing business with Plaintiff. Plaintiff asserts Amerisure is responsible for
ARC's decision to no longer work with Plaintiff was because Plaintiff chose not to
retain ARC as general contractor in repairing the property. Plaintiff provides no
evidence other than its own opinion.

Plaintiff's business was open and operating immediately following the
Storm.

This work includes repairs to divots created by Equipment during repairs
and Repairs to "Chips" in parking lot asphalt. Plaintiff's authorized representative

[20]

testified that the divot was caused by large equipment being brought in to work on

the building after the loss and that he assumes that the tornado caused the

"chipping" damage to the parking lot.

The Policy contains the following provisions regarding property that is covered:

***

PROPERTY COVERED
"We" cover direct physical loss to covered property at a "covered location"
caused by a covered peril.

BUILDING PROPERTY

1. Covered Building Property – Covered Building Property means building
and structures and:

a. Completed additions;
b. Fixtures, machinery, and equipment which are a permanent part of a
covered building or structure;
c. Outdoor fixtures;
d. Personal property owned by "you" and used to maintain or service a
covered building or structure or its premises. This includes air-
conditioning equipment; fire extinguishing apparatus; floor coverings; and
appliances for refrigerating, cooking, dish washing, and laundering;
e. If not covered by other insurance, buildings and additions to buildings
under construction, alteration, and repair including:

1) Materials, equipment, supplies, and temporary structures, on or
within 1,000 feet of a "covered location", intended and designated
for use in the construction, alteration, and repair of buildings or
additions to buildings; and

2) "Your" contractual liability for the interest of contractors and sub-
contractors in buildings and additions to buildings under
construction, alteration, and repair such as materials, equipment,
supplies, and temporary structures, on or within 1,000 feet of a
"covered location", intended and designated for use in the
construction, alteration, and repair of buildings or additions to

[21]

buildings;

f. Building glass;
g. The following property if it is located on or within 1,000 feet of a covered building or structure:

1) Radio and television towers, antennas, satellite dishes, masts, lead-in wiring, and guy wires. This includes foundations and any other property that is permanently attached to any of these types of property;

2) Awnings or canopies; and

3) Fences;

h. Signs, whether or not they are attached to covered buildings, or structures;
i. Foundations of buildings, pilings, and underground pipe. We pay up to the "limit" shown on the "declarations" for covered property at any one covered location for loss to:

1) Foundations of buildings, structures, machinery, or boilers if their foundations are below:

a) The lowest basement floor, or
b) The surface of the ground, if there is no basement;

2) Pilings, piers, wharves, docks, or retaining walls;
3) Underground pipes, flues, or drains.

*** 

The Policy contains the following provisions regarding property that is not

covered:

*** 

PROPERTY NOT COVERED

[22]

15. Property That is Obsolete – "We" do not cover property that is not maintained in working order, or that is out of date and not being used.

*** 

The Policy contains the following provisions regarding Plaintiff's

obligations:

*** 

WHAT MUST BE DONE IN CASE OF LOSS

5. Records – "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. Damaged Property – "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

9. Cooperation "You" must cooperate with "us" in performing all acts required by the COMMAND® coverages.

*** 

The Policy contains the following provisions regarding valuation and

payments:

VALUATION

1. Replacement Cost – The value of covered property will be based on replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

   The replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the

[23]

damaged or destroyed property.

Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

This replacement cost provision does not apply to paragraphs 3. through 13. below.

2. Actual Cash Value – When Actual Cash Value is indicated on the "schedule of coverages" for covered property, the value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) except as provided in paragraphs 3. through 13. below.

***

HOW MUCH WE PAY

5. Insurance Under More Than One Coverage – If more than one coverage of this policy insures the same loss, "you" can make claim under only one of the coverages.

7. Loss Settlement Terms – Subject to paragraphs 1., 2., 3., 5., 6., and 7. under How Much We Pay and coinsurance provisions (if applicable), "we" pay the lesser of:

    a.  The amount determined under Valuation;
        b. The cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or
        c. The "limit" that applies to covered property.
    b.

***

LOSS PAYMENT

1. Our Options – In the event of loss covered by this coverage form, "we" have the following options:

[24]

a. Pay the value of the lost or damaged property;
b. Pay the cost of repairing or replacing the lost or damaged property;
c. Rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or
d. Take all or any part of the property at the agreed or appraised value.

"We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

\*\*\*

The Policy contains the following provisions regarding coverage for the roof

\*\*\*

Loss or damage to the "roof" will be adjusted based on the Actual Cash Value.

Loss or damage to the balance of the building will be adjusted based on the Replacement Cost. The terms Actual Cash Value and Replacement Cost are described on page 27 of form CP 7600 Command Property Coverage Part Commercial Output Program under the section entitled Valuation.

For loss or damage to the "roof", for the above listed location [3634 Pennridge, Bridgeton, MO 63044], "we" will pay only the amount in excess of $10,000 in any one occurrence. If there is damage to the "roof" and other property, the $10,000 applies to all losses, so that two deductibles will not apply on the same occurrence.

"Roof" is defined as:

• The top covering
• All decking
• All beams and joists
• Soffit

[25]

- Fascia
- Insulation

\*\*\*

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.,* 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). A party resisting summary

judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000).

## Discussion

Defendants argue Plaintiff has failed to establish, with reasonable certainty, its damages. "Damages for breach of contract must be shown with reasonable certainty, and the plaintiff bears the burden of providing a rational estimate of the damages…" *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 769 (8th Cir. 2020).

As Defendant argues, Plaintiff has provided Defendant with nine valuations of its damages. Indeed, the damages claimed has changed over the years. Plaintiff has duplicated a number of the same damages under various coverages of the Policy.  Nowhere in the record is there a clear, unequivocal claim of the damages Plaintiff's property incurred as a result of the covered incident, *i.e.,* the storm.

Plaintiff's expert's opinion addressed "potential" storm related damages, and he acknowledged that Plaintiff would not be entitled to some of the damages he included in his opinion. His report did not include storm related Business Personal Property, Business Income, or Extra Expense damages, while Plaintiff claims such damages in its demand.

The record establishes Defendant attempted to obtain documentation and support for the damages Plaintiff claims. These attempts were thwarted through Plaintiff's failure to respond to correspondence and its reiteration that the support for the damages was already in Defendant's possession. The problem, however, with this assertion is that Plaintiff's documents were for estimates, were duplicative and were for items which could not be separated as to storm damage or upgrades that Plaintiff chose to perform.

Plaintiff's documentation is a mixture of paid items and estimates Plaintiff received. There is no indication in the documentation that Plaintiff accepted the bids it received for any of the work detailed in the bids. As such, Plaintiff is not entitled to receive damages for repair or replacement. As Defendant correctly argues, Plaintiff therefore is only entitled to the Actual Cash Value ("ACV") of the property at the time of loss. Plaintiff failed to produce any evidence in response of the ACV of the claimed damages to the property.

Under the Policy, Plaintiff is required to cooperate with Defendant in the

investigation of the claim, including,

> a signed, sworn proof of loss" including "a detailed estimates for repair or
> replacement of covered property; and [a]n inventory of damaged and
> undamaged covered property showing in detail the quantity, description,
> cost, actual cash value, and amount of the loss.  "You" must attach to the
> inventor copies of all bills, receipts, and related documents that substantiate
> the inventory."

> Cooperation clauses are valid and enforceable in Missouri. *Hendrix v. Jones*,
> 580 S.W.2d 740, 742 (Mo. 1979). "Missouri courts have consistently
> acknowledged an insurer's right to a complete investigation of a claim,
> including examinations, and have found that the insured's failure to assist in
> the investigation precludes any coverage." *Roller v. Am. Modern Home Ins.
> Co*., 484 S.W.3d 110, 116 (Mo. Ct. App. 2015). To deny coverage, "an
> insurer must prove: (1) a material breach of the cooperation clause; (2) the
> existence of substantial prejudice as a result of the breach; and (3) the
> exercise of reasonable diligence to secure the insured's cooperation." *Med.
> Protective Co. v. Bubenik*, 594 F.3d 1047, 1051 (8th Cir. 2010).

*McClune v. Farmers Ins. Co., Inc.*, 12 F.4th 845, 849 (8th Cir. 2021).

Missouri courts have recognized an insurer's right to a complete

investigation of a claim, including examinations, and that the insured's failure to

assist in the investigation precludes any coverage. "*Union Ins. Co. of Providence v.

Williams*, 261 F.Supp.2d 1150, 1152 (E.D.Mo.2003)(holding that cooperation

clauses are valid and enforceable under Missouri Law). 'Once the insurer proves

the material breach of a cooperation clause, the insurer may deny liability coverage

under the policy.' *Id.* at 1152." *Roller,* 484 S.W.3d at 116.

Failure to provide the appropriate, clear, and detailed information results in prejudice to the insurer. It impedes the insurer's "ability to fully and efficiently investigate the facts applicable to [the insured's] claim…, thereby prolonging [the insured's] [] investigation; [the insurer] repeatedly noted that the information [the insured] did provide was insufficient to allow it to determine" if it owed Plaintiff additional damages. *Northrop Grumman Guidance & Elecs. Co., Inc. v. Emps. Ins. Co. of Wausau*, 612 S.W.3d 1, 26 (Mo. Ct. App. 2020).

The record is replete with Defendant's attempts to secure the information it needed to evaluate Plaintiff's new claim.  After paying what it could substantiate as a result of the storm, Defendant meticulously and diligently requested clarification, documentation, and details of what was storm related and what was not.  Plaintiff all but ignored most of the requests. When it did respond, it simply told Defendant it had all that was needed. The record clearly establishes Defendant did not.  Varying amounts, duplicate amounts claimed for the same damages, and a mixture of covered and non-covered expenses.

## Conclusion

Based upon the foregoing, Defendant is entitled to judgment as a matter of law based on Plaintiff's failure to cooperate, as provided in the policy at issue, with

Defendant in establishing, to a reasonable certainty, the additional damages Plaintiff claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 53], is **GRANTED**.

An appropriate judgment is entered this same date.

Dated this 17th day of February 2023.


_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE